Taliaferro, J.
This case was before us at the July term of this court at Monroe, in 1873, on the appeal by the defendant from a judgment of the lower court sustaining the plea of res judicata, filed by the plaintiff. The judgment then appealed from was annulled and the case remanded, to be tried on the merits.
On trial had on the remanding, judgment was rendered in favor of the plaintiff for the land but refusing her claim ior rents. The defendant has appealed. Plaintiff prays an amendment of the judgment giving her rents.
*602 The action is a petitory one. The plaintiff bases her title on a patent, in her favor, issued by the United States for the lands in controversy.
The defendant answers, denying any right in plaintiff to the land claimed by her, and avers that the United States patent claimed under was illegally and erroneously issued to the heirs of G. W. Copley, and was procured by fraud and ill practices. The defendant claims by location of an internal improvement warrant, numbered 773. The plaintiff, by virtue of the act of 1851, giving bona fide purchasers from Maison Rouge, a preference in purchasing from the United States.
In being again called to consider this vexed and long continued litigation, we can not but be forcibly impressed with the fact presented by a voluminous record, containing all the proceedings that took place in the controversy before the various officers of the land department constituted by the laws of the United States, judges authorized to determine such contests, that the plaintiff was successful, and obtained the award in her favor by the successive decisions of the various officers of the land department before whom the case was carried, by the provisions of law, culminating at last by the judgment of the Secretary of the Interior. It certainly warrants the inference that justice was attained in the case when the parties had such ample means and time allowed them to exhibit their claims and present their evidence. It seems scarcely practicable that fraud could have escaped detection, had it been resorted to by either of the parties, when each was lynx-eyed, keen and active in the. promotion of her own claims; nor that during the several trials on the several appeals, errors could have crept in before the several tribunals in which the parties were heard; tribunals peculiarly qualified to judge and determine all the questions arising in-the litigation. These considerations seem to have entered the mind of the judge a quo, and to have borne much weight in the formation of his decree in the case.
It becomes our duty, however, to hear the defendant upon her allegations of unfairness, fraud and ill practices, by which she avers the plaintiff obtained judgment in the contest before the land department.
We understand the defendant as laying the gravamen of her case upon the allegation of fraud in George W. Copley, in obtaining the recognition by the government of a right to purchase at the minimum price, the lands in controversy, when in truth he had no such right; that his pretensions to such right was fictitious, and entitled to no respect, and, therefore, his claim so set up should be rejected.
Secondly, we understand her as complaining that wrong and injury have resulted to her from the refusal of the officers of the land department to recognize the location of the internal improvement warrant, which location she alleges she made.
*603 Each party displays the claim of title from Cox down to Copley, of eight hundred and sixty arpents of land to be taken from the upper side of lot No. one, in the Maison Rouge grant. But the defendant claims no right under that title. Coming down to the sale of the land under a foreclosure of mortgage on the twentieth of August, 1838, it appears that a division of the land took place, by agreement and by the coroner’s deed to the purchasers, Fenner and Scarborough, title was made to Fenner of the upper half of the tract and to Scarborough of the lower half. Fenner, it seems, sold his half to Caldwell, and Caldwell sold to Brigham. It was next sold by the coroner under a judgment against Joseph and Brigham, and purchased by Smith, who sold to Copley, who thus acquired title to the upper half. Under a judgment against Scarborough, his half of the land, being the lower half, was sold at sheriff’s sale, and purchased by James Garrett, who sold to Copley who, in this manner acquired title to the lower half and became owner of the whole tract. It seems that the land claimed by Mrs. Dinkgrave and in controversy in this suit, lies on the lower half of the tract. It is denied on the part of the defendant that there were any improvements or cultivation on the lower half, and therefore no right accrued to any of the parties under the provisions of act of Congress giving to purchasers under the Cox title the privilege of entering the land so purchased at the minimum rate, because improvement and cultivation were required as a condition upon which the privilege was granted.
On the other hand, it is contended that the tract of eight hundred and •sixty arpents was acquired by Brigham, in his purchase from Cox, as one tract; only that he improved and cultivated it as a whole for several years before he sold it. It was as we, have seen, subsequently divided and owned by two different persons, and lastly, that Copley became owner of the whole tract as an entirety, in the same manner that Brigham owned it after his purchase.from Cox. There can be no doubt that if Brigham remained owner, he could have entered the entire tract at the minimum government price. Then, say the plaintiff’s counsel, when Copley became purchaser of the lower half and the separate ownerships of the halves were blended in Copley as one owner, and the same status existed as existed when Brigham owned the entire tract, cultivation and improvement upon any portion of the entire eight hundred and sixty arpents, whether upon the upper or the lower half, carried with it the right to purchase the whole at government price. We can see no forcible objection to this reasoning. The entire tract, as purchased from Cox, was never actually divided by a survey. No line of demarcation, it seems, was ever run and established, indicating with precision which was the upper half or which *604 the lower half. There never was a time when, as between claimants and the United States, there was a separate claim set up in virtue of improvement and cultivation, to one-half of the eight hundred and sixty arpents as the upper half, and a like claim set up for the like reason on the other portion as the lower half. The government never had to deal with claimants, one portion of whom set up right to four hundred and thirty arpents of these eight hundred and sixty arpents by virtue of their purchase from Cox, and improvements and cultivation by them on those four hundred and thirty arpents, and another portion who set up on the same grounds precisely their claim to the other four hundred and thirty arpents. Had Brigham, for instance, never parted with his rights upon the entire tract lie purchased from Cox, and limited his application under the benefit of the act of Congress to only half the number of arpents he bought from Cox, and that half, the one on which his improvements were made and his cultivation carried on, then, having abandoned all claim upon tlie other half any other claimant to that half would have to establish separate improvement and cultivation on that half. Brigham might have purchased from the government all' that he purchased from Cox, or any part thereof, in virtue of his improvements and cultivation upon the land as an entire tract, limiting his claim, however, in case of taking less than the whole to such part of the entire tract as embraced his improvements. Copley, it is shown, was owner of the whole tract in 1844, and that he cultivated upon it several years before 1849. This we are of opinion entitled him to the benefit of the provisions of the act of Congress enacted in the interest of persons who purchased lands in the Maison Rouge grant, under the title of D. N. Cox. We regard it therefore of little moment whether or not Copley made improvements upon that portion of the tract which, during the separate ownerships before referred to, was called the lower half. The testimony on that point is contradictory.
On the part of the defense, there are numerous other objections raised to the validity of the title by which the plaintiff claims the property in controversy. Good faith in Copley in acquiring title and want of consideration as shown by several of the transfers, it is argued, render these transfers null. The denial by the plaintiff of any right in the defendant to set up these objections is, perhaps, not without force. If fraud were perpetrated and malpractices resorted to by Copley in procuring transfers to himself, they were acts that took place seven years at least before the defendant’s alleged purchase of an improvement and settlement upon the lands began. These frauds, if they were frauds, did no injury to the defendant. If injury resulted to any body it was to the parties with whopi he dealt; but thirty years have *605 intervened and we do not find from the records that any of these parties or the heirs of any of them have ever complained. But conceding the right to the defendant to except to the validity of those acts, we are not prepared, under all the facts shown in relation to them, to pronounce their nullity.
The title presented by the defendant we will now advert to. Her title is based upon an alleged location of an internal improvement warrant on the land in dispute. The fact of such location ever having been made by the defendant, is expressly denied by the plaintiff. The defendant makes no pretension to any other right.
By an act of Congress, passed September 4, 1841, the United States made a donation to Louisiana and other States of large portions of the public domain for the purpose of internal improvement. This State, in subsequently disposing of these lands, adopted the method of selling warrants, termed internal improvement warrants, which were located by the purchaser or his assignee. But the selection of the lands donated to the States was made under the supervision of the Land Department of the Government and subject to its approval. The commissioner of the general land office, in August, 1847, issued instructions to the registers and receivers in regard to the selection or location of internal improvement land under the donation act of 1841. Through the officers of the land department the construction given by the executive department to the act of 1841, was made known. Instructions were issued, defining the mode of proceeding in the selection and location of the lands to be transferred to the States. It was announced through the land department “that the law allowed selections to be made of public lands, whether offered or unoffered, but no State selection is admissible of any land which is or may be reserved from sale by any law of Congress, or proclamation of the President, or on any tract which is reserved or' withdrawn from market for any purpose.” Lester’s Land Laws, vol. 1, p. 502. We think it is clearly shown that under the act of Congress of twenty-seventh January, 1851, all the land within the limits of the Maison Rouge grant was reserved from sale, entry or location, from the date of the act until three months after the public notice required to be given by the second section of the act; that that notice was not given until the twenty-fifth of October, 1853. The location of the defendant’s warrant could not, therefore, have been made on the fifth of September, 1853, because it was then forbidden by the law of Congress above recited.
We consider it unnecessary to consider the bills of exceptions presented by the record. We come to the conclusion that no location of the internal improvement warrant of the defendant was made.
For the reasons just stated, we think it clear that on the fifth of September, 1853, the defendant 'was debarred from making a location of her internal improvement warrant upon any land within the limits of *606 the Maison Rouge grant; and that subsequently, viz: in December, 1854, and on the twenty-first January, 1855, when she again applied to locate it, it was out of her power to locate it upon the lands in controversy, because before her last applications were made, those lands had been secured to the plaintiff under pre-emption right in pursuance of the provisions made by law in favor of purchasers in good faitli under the title of Cox, and who had improved and cultivated upon those lands.
It was the express purpose of the enactment to first ascertain and provide for all persons of that class by receiving proof of their claims and confirming the right of pre-emption upon them. Pending this period entries of lands on other claims within the grant were suspended, and locations of warrants could not be effected. We conclude the defendant never acquired title, and that the plaintiff did.
It is therefore ordered that the judgment of the district court be affirmed with costs. The right to claim rents and revenues is reserved to the plaintiff in a separate action.
Chief Justice Ludeling recused in this case.
Rehearing refused.